UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Marc A. Pergament, *as Chapter 7 Trustee of the Estate of Harold Adamo Jr.*, <br><br> *Appellant*, <br><br> – against – <br><br> Brooklyn Law School, <br><br> *Appellee.* | **1:18-CV-2204 (ARR)** <br><br> **1:18-CV-2235 (ARR)** <br><br> **1:18-CV-2236 (ARR)** |
| Marc A. Pergament, *as Chapter 7 Trustee of the Estate of Harold Adamo Jr.*, <br><br> *Appellant*, <br><br> – against – <br><br> Fairfield University, <br><br> *Appellee.* | |
| Marc A. Pergament, *as Chapter 7 Trustee of the Estate of Harold Adamo Jr.*, <br><br> *Appellant*, <br><br> – against – <br><br> Hofstra University, <br><br> *Appellee.* | **Amended Opinion & Order** |

ROSS, United States District Judge:

In this consolidated bankruptcy appeal, the appellant, a bankruptcy trustee, seeks to overturn the determination of the bankruptcy court that he cannot recover from three institutions of higher learning payments that the debtor made for his children's education.

1

Specifically, the bankruptcy court ruled that the schools were not "the initial transferee[s]" of the payments within the meaning of 11 U.S.C. § 550(a) but rather subsequent transferees that took in good faith from the debtor's children, and thus that the schools were entitled to the protections of § 550(b).

The bankruptcy court's analysis of this thorny issue was sound, but because the bankruptcy court appears not to have grappled with a key factual question, I vacate the decision below and remand the cases for further proceedings.[1]

## BACKGROUND

On September 30, 2008, a lawsuit was filed against the debtor in these bankruptcy actions, alleging that the debtor had "bilk[ed]" his friend out of "millions of dollars" by encouraging the friend to buy coins from the debtor at inflated prices. *See* Complaint at 1, *Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014) (No. 08-CV-3995).

While that litigation proceeded, the debtor's son Nicholas in 2009 matriculated at appellee Hofstra University, which he attended until his graduation in 2013. Appellant App. Pt. I, at TA0006, ECF No. 5-1.[2] And from April 2009 until December 2012, the debtor made payments totaling approximately $120,000 to Hofstra for Nicholas's tuition. *See id.*; Appellant App. Pt. II, at TA0212–30, ECF No. 5-2.

Similarly, in 2012, the debtor's daughter Francesca matriculated at appellee Fairfield University, which she attended until her graduation in 2015. Appellant App. Pt. I, at TA0008. From August 2012 until December 2013, the debtor made payments totaling approximately

---

[1] An earlier version of this opinion could have been read to imply a factual finding that was not intended. This opinion has been amended to clarify any ambiguity as to my decision.

[2] All citations of the form "ECF No. ___" pertain to the lead docket in this consolidated appeal, No. 1:18-CV-2204.

$90,000 to Fairfield for Francesca's tuition. *See id.*; Appellant App. Pt. IV, at TA0632–40, TA0661, ECF No. 5-4.[3]

Meanwhile, the lawsuit against the debtor came to a close. On February 6, 2014, after a bench trial, Judge Joseph F. Bianco of this district ruled for the plaintiffs in that action (*Marini*, 995 F. Supp. 2d 155, *aff'd*, 644 F. App'x 33 (2d Cir. 2016)), and on April 16, 2014, the court entered judgment against the debtor in the amount of $11,304,079, plus interest (Judgment at 1, *Marini*, 995 F. Supp. 2d 155 (No. 08-CV-3995)). That was evidently more than the debtor could afford, and he filed a chapter 11 bankruptcy petition on August 6, 2014 (Appellant App. Pt. I, at TA0005).

While his bankruptcy case proceeded, however, the debtor continued to spend money on his children's higher education. In 2015, the debtor's son Andrew matriculated at Hofstra, and Francesca began attending appellee Brooklyn Law School. *Id.* at TA0006, TA0009. Between May 2015 and July 2016, the debtor made payments totaling approximately $20,000 to Hofstra for Andrew's tuition and payments totaling $27,692.42 to Brooklyn Law for Francesca's tuition. *See id.*; Appellant App. Pt. II, at TA0250–68; Appellant App. Pt. III, at TA0516–22, ECF No. 5-3.

Then on July 13, 2016, the bankruptcy court converted the debtor's chapter 11 case to a chapter 7 case and ordered the appointment of a trustee. *See* Appellant App. Pt. I, at TA0005. On August 17, 2016, that trustee, the appellant here, initiated adversary proceedings in the

---

[3] The trustee asserts, and Fairfield disputes, that another tuition payment to Fairfield, of $22,715, made in July 2014, also effectively came from the debtor. *See* Appellant App. Pt. I, at TA0008; Appellant App. Pt. IV, at TA0663. That issue can be explored, as necessary, by the bankruptcy court on remand.

bankruptcy court against the three schools to avoid and recover from them all the above-mentioned tuition payments. *See id.* at TA0004–05.[4]

On March 28, 2018, on cross-motions for summary judgment in the three adversary proceedings, the bankruptcy court granted summary judgment to the schools in a single opinion, ruling that "the undisputed facts establish that the Debtor's children were the initial transferees of the Debtor's transfers, and that the [schools] are entitled to the good faith defense provided by § 550(b)." *Id.* at TA0005. Critical to its decision, the bankruptcy court found it undisputed that all three schools treated tuition payments that they received in substantially the same way:

> [A]ny payments received, from whatever source, were placed in the respective student's school account; funds were only applied toward tuition, and transferred to the school's general account, upon the student's registration for classes; in the event the student withdrew from the program, the student received the refund of any balance in the account.

*Id.* at TA0010.

That grant of summary judgment is the subject of this appeal. Because the trustee has conceded that the schools took the payments in good faith, the sole question on appeal is whether the schools are initial transferees or subsequent transferees under § 550 of the Bankruptcy Code.[5]

---

[4] The trustee sought to avoid as constructively fraudulent transfers the tuition payments made before the debtor filed for bankruptcy and as unauthorized postpetition transfers the tuition payments made after the debtor filed for bankruptcy. *See* Appellant App. Pt. I, at TA0004.

[5] Because it found that the schools were completely protected by § 550, the bankruptcy court did not reach the question whether the debtor received "fair consideration for the [prepetition] tuition payments" (*id.*; *see also* N.Y. Debt. & Cred. Law § 273-a) or the question whether "the post-petition tuition payments . . . were unauthorized post-petition transfers of property of the estate" (Appellant App. Pt. I, at TA0004; *see also* 11 U.S.C. § 549). Nor have those questions been briefed here.

## STANDARD OF REVIEW

"[I]n bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *R² Invs., LDC v . Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 482–83 (2d Cir. 2012) (citation omitted). Because the bankruptcy court ruled for the schools on cross-motions for summary judgment, I view the facts "in the light most favorable" to the trustee (*Christy v. Alexander & Alexander of N.Y. Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 55 (2d Cir. 1997)). *See Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 7 n.10 (S.D.N.Y. 2007).[6]

## DISCUSSION

Section 550 provides that, when a transfer is avoided under certain sections of the Bankruptcy Code, "the trustee may recover, for the benefit of the estate, the property transferred," from either "the initial transferee of such transfer" or "any [subsequent] transferee of such initial transferee." § 550(a).[7] The trustee may *not* recover from a subsequent "transferee that takes for value . . . , in good faith, and without knowledge of the voidability of the transfer avoided." § 550(b)(1). No such good-faith exception applies for initial transferees. *See Carroll v. Tese-Milner (In re Red Dot Scenic, Inc.)*, 351 F.3d 57, 58 (2d Cir. 2003). Thus, where, as here, the transferees' good faith is not in dispute, much depends on the determination of whether transferees were initial transferees or subsequent transferees.

The Bankruptcy Code does not define "initial transferee," but a body of case law has developed that distinguishes "the initial recipient—that is, the first entity to touch the disputed

---

[6] Because "the facts and legal arguments are adequately presented in the briefs and record," I find that "the decisional process would not be significantly aided by oral argument" (Fed. R. Bankr. P. 8019(b)(3)).

[7] The statute also allows for recovery from "the entity for whose benefit [the] transfer was made" (§ 550(a)(1)), but the trustee does not argue that the schools can be classified as such (*see* Reply Br. 15, ECF No. 12).

funds—[from] the initial transferee." *Finley*, 130 F.3d at 56. The seminal case in this line is *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988), in which the Seventh Circuit ruled that "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893. In *Finley*, the Second Circuit endorsed *Bonded* and adopted what it called "the 'mere conduit' test for determining who is an initial transferee under § 550(a)(1)." 130 F.3d at 57–58. Since *Finley*, the law in this circuit is that "an initial transferee must exercise dominion over the funds at issue and be able to put them to 'his own purposes'" and that "a party is *not* an initial transferee if it was a 'mere conduit' of the funds." *Manhattan Inv. Fund*, 397 B.R. at 15. "A 'mere conduit' . . . has no dominion or control over the asset; rather, it is a party with actual or constructive possession of the asset before transmitting it to someone else. Mere conduits can do no more than transmit a transferor-debtor's funds to a transferee." *Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc. (In re Warnaco Grp., Inc.)*, No. 03 Civ. 4201(DAB), 2006 WL 278152, at *6 (S.D.N.Y. Feb. 2, 2006).

## A. Whether the schools were mere conduits or initial transferees of the tuition payments depends on when the payments were made.

Tuition for an undergraduate or law degree is not owed all at once. Rather, it is typically collected on a periodic basis, such as per semester. *See, e.g.*, Appellant App. Pt. IV, at TA0751 (stating that, at Fairfield, "[t]uition invoices are sent out in July for the following Fall Semester and in December for the following Spring Semester"). And, at least in the case of the appellee schools, students who withdraw from their program may be entitled to a refund of tuition payments already made on their behalf, depending on how early in the school year they withdraw. *See* Appellant App. Pt. I, at TA0010. Whether the schools exercise dominion and control over tuition payments immediately upon receipt thus depends on when each particular payment is made. As explained below, in the case of any tuition paid early enough that the

recipient school would have been obligated to refund it to the student if he or she then withdrew, the school must be classified as a mere conduit and the student an initial transferee, regardless of whether the student actually withdrew from school. But as for tuition paid so late that the student could never have had any right to obtain it, even had he or she withdrawn from school immediately, the school had dominion and control from the outset and thus is properly considered the initial transferee. For clarity, I refer to payments of the first type as "refundable" and payments of the second type as "nonrefundable."

1. As to refundable payments, the bankruptcy court found that the Seventh Circuit's landmark decision in *Bonded* was "exactly on point" (*id.* at TA0021). Although the fact patterns can be differentiated, I agree with the bankruptcy court that *Bonded* shows why the schools cannot be considered initial transferees of these payments.

In *Bonded*, a debtor "sent [a] Bank a check payable to the Bank's order . . . with a note directing the Bank to 'deposit this check into [a third party]'s account.'" *Bonded*, 838 F.2d at 891. Once the money was routed into the account, the third party "instructed the Bank to debit the account $200,000" as repayment of a loan that he owned the bank. *Id.* The trustee in that case argued that the bank was the initial transferee of the debtor "because [the bank] was the payee of the check it received," but the court rejected this argument, ruling that the bank "acted as a financial intermediary" and "received no benefit" from the initial transfer. *Id.* at 891, 893. The Seventh Circuit's reasoning is instructive, as the facts are reminiscent of this appeal:

> [The bank] received nothing from [the debtor] that it could call its own . . . .
> The Bank had no dominion over the $200,000 until . . . [the third party]
> instructed the Bank to debit the account to reduce the loan; in the interim, so
> far as the Bank was concerned, [the third party] was free to invest the whole
> $200,000 in lottery tickets or uranium stocks.

*Id.* at 893–94.

Just so here: even though the schools received the tuition payments directly from the debtor and eventually applied those payments toward his children's incurred tuition charges, the schools did not have dominion over the tuition payments until the children no longer had any legal right to a refund. Before then, the schools' retention of the payments was subject to the possibility that the debtor's children would withdraw from school and take the money with them, and thus the schools had insufficient dominion and control at that point to be considered initial transferees. *See Meoli v. Huntington Nat'l Bank*, 848 F.3d 716, 725 (6th Cir. 2017) ("As our sister circuits have explained, the account-holder's right to withdraw the deposits keeps the bank from obtaining dominion and control."); *cf. Menotte v. United States (In re Custom Contractors, LLC)*, 745 F.3d 1342, 1350 n.6 (11th Cir. 2014) ("[A] party who has nearly unlimited ability to use funds does not, for the purposes of our mere conduit or control test, 'control' those funds when there exists an obligation to provide those funds to a third party.").

2. By the same logic, the schools were the initial transferees of any nonrefundable tuition payments. "[W]hen an initial recipient receives funds as payment of an existing debt, the recipient exercises sufficient control to be held liable as an initial transferee." *Custom Contractors*, 745 F.3d at 1350. That's because in that situation, "neither the transferor, nor any other party, has any rights . . . in the funds held by the initial transferee." *Id.*

In *Bonded*, for example, the court posited that if the check in that case had come with the instructions, "'use this check to reduce [the account holder's] loan' instead of 'deposit this check into [his] account,'" then the bank would indeed have been the initial transferee, for the third-party account holder would never have had dominion over the money. 838 F.2d at 892; *see also Red Dot*, 351 F.3d at 58 (ruling that party "who exercised no control over the funds at issue once they were transferred from [the debtor]'s account[ ] was not the initial transferee"). Similarly here, for any payments that the debtor made after the schools no longer had any

obligation to issue a refund, the schools were the initial transferees, since at no time did the children have any dominion over the money.

## B. The parties' arguments to the contrary fail.

### 1. *The debtor's children were not mere conduits.*

The trustee does not forcefully dispute that the schools were mere conduits of refundable tuition payments but argues that the "Debtor's children were mere conduits of the Tuition Payments" as well (Appellant Br. 15, ECF No. 5). The trustee argues that it was "the common understanding of all parties that the purpose of the Tuition Payments was to fund the Debtor's children's educations and that the sole function of the Debtor's children in the transaction was to attend school." Reply Br. 6, ECF No. 12.

The trustee is right that that fact distinguishes these cases from *Bonded*, in which the account holder might plausibly have used the money in his account for any number of things. *See Bonded*, 838 F.2d at 894; Appellant Br. 20. Ultimately, however, this distinction does not lead to a different conclusion: For one thing, if the debtor's children had withdrawn from school, they could have used the refunded money "however [they] wanted to" (*Meoli*, 848 F.3d at 728). *See* Appellant App. Pt. I, at TA0017 ("The children had no legal obligation to return the funds to their father. They could have chosen to take a trip or go on a shopping spree . . . ."). Moreover, the existence of *some* restrictions on how a recipient of funds uses its money does not prevent that party's being considered an initial transferee. *See Manhattan Inv. Fund*, 397 B.R. at 18 ("[A] party can be an initial transferee even if it cannot use received funds for endeavors unrelated to the underlying transaction.").

The trustee insists that "the Debtor's children were obligated to use the Tuition Payments to secure college/law school diplomas" (Reply Br. 6), but he offers no legal support for this conclusory assertion. Yet even if the debtor's children had somehow obligated

themselves to spend the money transferred to their school accounts on their education, it is not clear that that would change the result. *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26 (4th Cir. 1989), demonstrates that an initial transferee is not rendered a mere conduit simply because it has already pledged to use the transferred funds in a certain way. In *Lowry*, the Fourth Circuit ruled that a corporation that had received funds from a debtor was the initial transferee of those funds, notwithstanding that the corporation had previously assigned its accounts receivable to another corporation and thus that other corporation ultimately received the funds. *See id.* at 27–29. Applying *Bonded*, the court observed that the recipient "used the funds for its own purpose"—that is, "to reduce its debt" to the assignee corporation. *Id.* at 29. "The fact that [the initial transferee] could not have used the funds for other purposes" was irrelevant. *Id.* If the debtor's children in these cases were similarly obligated to give the money in their school accounts to the respective schools, they would still be using the money for their own purposes—obtaining degrees.

The trustee tries to distinguish *Lowry* by citation to *CNB International, Inc. Litigation Trust v. Lloyds TSB Bank PLC (In re CNB International, Inc.)*, 440 B.R. 31 (W.D.N.Y. 2010), in which the court seemed to suggest that the intentions of the debtor are legally relevant to the initial-transferee analysis. *See* Appellant Br. 24. A careful reading of *CNB*, however, reveals that that case turns not on the debtor's intentions but on the fact that the transfer occurred only because the initial recipient was contractually bound to transfer the funds to the ultimate transferee.

In *CNB*, the debtor planned to purchase a corporation whose assets had previously been pledged to a bank. *See* 440 B.R. at 35. The transfer at issue was part of a multiparty transaction in which, "[p]ursuant to written instructions approved ahead of time by all parties," the debtor first transferred money to the corporation and then that money was "immediately disbursed" from the corporation to the bank. *Id.* at 36. "In exchange, [the bank] released its

. . . security interest in the assets of [the corporation] being purchased by [the debtor]." *Id.* On those facts, the court ruled that the corporation "constituted a mere conduit and [the bank] was the initial transferee." *Id.* at 41.

The trustee notes that the court in *CNB* explicitly distinguished *Lowry*:

> [T]he *transferor* in *Lowry* did not care what the initial transferee did with the funds once they left the *transferor's* possession; at that point the funds were at the discretion of the initial transferee, which discretion the transferee had already exercised by contracting with the subsequent transferee. In contrast, CNB, as the transferor, would not have transferred its funds in the first instance if [the initial recipient] had not been bound to transfer them immediately to [the bank] in exchange for, *inter alia*, the release of [the bank's] . . . security interest.

*Id.* at 40–41 (citations omitted). Based on this language, the trustee argues that the schools should be considered initial transferees because the debtor here similarly "cared immensely about what was done with the Tuition Payments once they left his bank account." Appellant Br. 24.

The trustee's argument is reasonable but, in the end, unconvincing. As the *CNB* court stated, "the *crucial distinction* between the *Lowry* transaction and the [*CNB*] Transaction is that the initial transfer from CNB was contractually conditioned upon, *inter alia*, [the recipient's] immediate transfer of funds to [the bank]." 440 B.R. at 40 (emphasis added). The recipient in *CNB* thus "never had any discretion to do anything else with the [money]." *Id.*; *see also Finley*, 130 F.3d at 59 (holding that defendant's "role in the transfers of funds was that of a mere conduit" where defendant "had no discretion or authority to do anything else but transmit the money"). The trustee here acknowledges that the debtor's children were not contractually required to do anything (*see* Reply Br. 6); rather, as long as they remained entitled to a refund

of tuition, they had the discretion to do anything they wanted with the transferred money.[8] That suffices to distinguish this appeal from *CNB*.

The trustee also argues that the "Debtor's children [lacked] dominion and control over the Tuition Payments" because they did not believe that, "in the hypothetical event" that they dropped out of school, they had the option to "spend[ ] their father's money on a trip or shopping spree, as opposed to returning the money to Debtor." Appellant Br. 21. And the trustee asserts that, "as between the Debtor and his children, the obligation of the Debtor's children to pursue college degrees was no less real or definite than [a] contractual obligation." Reply Br. 11.

The debtor's children's beliefs and decisions are irrelevant. It may be true that they would have returned any refunded tuition to their father, but what matters is that they had the legal right to keep it. *See, e.g., 718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 260 B.R. 698, 717–18 (E.D. Pa. 2001) (distinguishing "question of whether one may or may not have *exercised* control over fraudulently transferred funds" from "question of whether one had the *right* to exercise control over fraudulently transferred funds"; and observing that "the 'dominion and control' test is purely concerned with rights"); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 296 (Bankr. N.D. Ill. 2002) (finding that debtor's daughters were transferees because they "possessed the right to put the [transferred] money to their own use" even though they "acted in accord with the Debtor's directions, and did not utilize the proceeds for their own benefit"), *aff'd sub nom. Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003).

It doesn't matter whether the children knew that they had the right to keep the money (*see, e.g., Whitlock v. Lowe*, 569 B.R. 94, 100 (W.D. Tex. 2017) ("Whether she knew that the status of the account had changed from a joint account . . . to an account solely under her

---

[8] The trustee's subsequent assertion that "the Debtor limited his children's right to use the Tuition Payments for any purpose other than paying tuition" (Reply Br. 10) is conclusory and unsupported in the record.

name, [the initial transferee] had the legal right to put the funds to any use she wished."), *appeal docketed*, No. 18-50335 (5th Cir. Apr. 26, 2018); *Roti*, 271 B.R. at 296 ("[The debtor's daughters'] subjective beliefs do not override the undisputed fact that they had the authority to withdraw the funds for their own purposes.")), and any familial or moral pressure that they may have felt is similarly beside the point (*see, e.g., Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528, 535 (6th Cir. 2003) (ruling that mother of debtors was initial transferee where she "had legal authority to do what she liked with the [transferred] funds" and there was "no evidence of some formal contractual arrangement that required her to obey the debtors' commands"); *Whitlock*, 569 B.R. at 101 ("She may have felt pressure to follow the instructions of her family members, but there is no evidence that she was legally obligated to do so.")).[9]

Finally, the trustee urges me to follow the decision of the bankruptcy court for the Middle District of Florida in *Tardif v. St. John the Evangelist Catholic Church (In re Engler)*, 497 B.R. 125 (Bankr. M.D. Fla. 2013), in which an entity that received payments earmarked for a third party was found to be a mere conduit. *See* Appellant Br. 16–17. In *Engler*, the debtors transferred money to their church for the benefit of a newly created nonprofit organization. 497 B.R. at 127–28.[10] The money was deposited into the church's "general operating account" and "commingled with the Church's general operating revenue," but the church maintained "a bookkeeping subaccount to separately account for . . . donations [for the nonprofit]" and disbursed the funds to the nonprofit upon the nonprofit's request. *Id.* at 128. The *Engler* court

---

[9] The trustee asserts, without support, that "*Whitlock* does not represent the law in the Second Circuit" (Reply Br. 9). I find no basis to conclude that there is a split of authority between the Fifth and Second Circuits on this issue. *Cf. Nisselson v. Salim (In re Big Apple Volkswagen, LLC)*, No. 11-2251 (JLG), 2016 WL 1069303, at *17 (Bankr. S.D.N.Y. Mar. 17, 2016) ("[W]hen courts speak of a party's lack of dominion and control over transferred assets, the focus is on whether the transferee has the legal right to put the assets to its own use—not whether the transferee had the right to do so but chooses not to exercise it.").

[10] The money was routed through the church, rather than given directly to the nonprofit, for tax purposes. *See Engler*, 497 B.R. at 127.

ruled that the church was a "mere conduit" because, "[d]espite depositing the [nonprofit's] donations into its general operating account, the Church was not free to use that money as it wished." *Id.* at 130. Because "the Debtors[] specifically earmarked their donations for the [nonprofit]," the court reasoned, "[t]he Church's use of the Debtors' donation was circumscribed by its legal obligations to the Debtors and the [nonprofit]." *Id.*

The trustee argues that the debtor's children are akin to the church in *Engler* and that the schools are like the nonprofit. *See* Appellant Br. 17 ("By issuing checks payable to [the schools], Debtor 'earmarked' the Tuition Payments for [the schools], precluding Debtor's children from using the Tuition Payments for purposes other than attending school and rendering them mere conduits of those payments.").

I do not agree. It is the schools that are like the *Engler* church, and the debtor's children resemble the nonprofit. *Cf.* Fairfield Br. 21, ECF No. 10 ("[T]he plain old common sense reality [is] that the Payments were made by Debtor to benefit Francesca, not Fairfield.") In *Engler*, the court's finding that the debtors had "earmarked their contribution for the [nonprofit]" was based on "the memo line of the check"—of which the church was the payee—"specifically" designating the money for the nonprofit. 497 B.R. at 128. Just the same, the debtor here made payments to the schools but instructed them that the payments were for the benefit of his children. *See, e.g.*, Appellant App. Pt. II, at TA0212–30 (showing checks from debtor, made out to Hofstra, designating "Nicholas Adamo" in memo line); *see also* Hofstra Br. 28, ECF No. 9 ("[T]he checks the Debtor made payable to Hofstra including Nicholas'[s] name and account number on the memo line . . . show that Hofstra was a mere conduit to Nicholas . . . just as the church was a mere conduit of the checks received in *Engler*."); *cf.* Fairfield Br. 20–21 ("[I]n *Engler* . . . the church had the . . . legal obligation to return the funds

it was holding as 'earmarked' while here . . . Francesca had no legal obligation to return the Payment to her father."). The schools were mere conduits; the debtor's children were not.

   *2. The result here is not dictated by the schools' internal bookkeeping.*

   As a matter of policy, the trustee argues that it would be "unjust" for the result in these cases to turn on the existence of a "student account system" that the schools "created for their own use and benefit." Reply Br. 10. "Had Appellees not established accounts in their respective students' names," the trustee asserts, "there would be no question as to Appellees' status as initial transferees under Section 550." *Id.* at 3.

   The trustee is correct that the schools' internal bookkeeping practices ought not affect the parties' substantive legal rights. Although the bankruptcy court emphasized the existence of the student accounts (*see, e.g.*, Appellant App. Pt. I, at TA0017 ("These student portals are akin to bank accounts, with the [schools] as the financial institutions maintaining those accounts.")), the outcome in these cases does not hinge on the existence of the accounts (*cf. id.* ("Put simply, the student maintained dominion and control over the funds in the account . . . because it was the student's decision whether to enroll in classes and have the funds applied towards tuition or to withdraw from the program and have the funds refunded directly to him or her.")).

   The significance of the entitlement to a refund is underscored by *Custom Contractors, supra*, in which a bankruptcy trustee sued to recover estimated-income-tax payments from the IRS. In that case, the debtor, a limited-liability company, made several payments to the IRS to cover its sole member's estimated income tax. 745 F.3d at 1345 & n.1. But in the end, the member ended up not owing any income tax, and the IRS thus issued him—not the debtor— a refund of the payments made. *Id.* at 1345. In its analysis, the Eleventh Circuit noted that "[a]t no point did [the member] *actually* owe income taxes." *Id.* at 1351. "When the Debtor made

the transfers to the IRS, it likely expected that [the member] would accrue tax liability . . . [b]ut, because that expectation was never realized, the IRS was always subject to the looming possibility that . . . the funds [would] be refunded to [the member]." *Id.* Accordingly, the court concluded that "the IRS, like [a] bank holding a deposit, cannot be held liable as an initial transferee." *Id.*

There was no suggestion in *Custom Contractors* that the IRS had held the funds in any sort of account accessible only to the member; rather, "the IRS deposited the funds in the general treasury, commingled them with other government funds, and spent them" (*id.*). Nevertheless, the court ruled that the transfer was "sufficiently similar to the deposit of funds into a bank account to conclude that the IRS acted as a mere conduit." *Id.* at 1352. The lesson of *Custom Contractors* is that it is not the existence of the "student accounts" that protects the schools in this appeal, but instead the undisputedly real obligation of the schools to refund tuition payments to the debtor's children in the event that the children withdrew from classes. *Cf. id.* at 1351 ("Strings were always attached to the transfer . . . .").

In contrast, *Perrino v. Salem, Inc.*, 243 B.R. 550 (D. Me. 1999), shows that the children would not have been initial transferees, despite the student accounts in their names, if they had had no right to a refund of the transferred money. In *Perrino*, a debtor purchased from a bank a cashier's check, made out to a third party, with an automobile dealership listed "on the face of the cashier's check," as if the dealership had purchased the check itself. *Id.* at 552–53. The debtor then gave the check to the dealership, which in turn delivered it to the check's designated payee in exchange for a vehicle. *See id.* at 553. In reversing the bankruptcy court's determination that the dealership was the initial transferee of the money, the district court observed that the dealership had no way of turning the check into cash. *See id.* at 560–61. Indeed, it "could not have done anything else with the cashier's check other than to exchange

it" with the payee. *Id.* at 561. Particularly salient here, the bankruptcy court in *Perrino* had assumed that the bank "would be obligated to give [the dealership] the funds represented by the check if [the dealership] elected not to purchase the [vehicle] from [the payee]." *Id.* at 561 n.7. In reversing, the district court noted that even if the cashier's check could have been revoked—which the district court found doubtful—"the funds would have been credited to [the debtor's] account over which [the dealership] had no control," not to the dealership. *Id.*

Here, unlike in *Perrino*, the debtor's children were not required to use the money transferred by their father to pay for tuition; they could have withdrawn from school and taken the money themselves, to do with as they wished. The schools would have refunded the money to them, not to the debtor. It is for that reason—not because the schools routed tuition payments through "student accounts"—that, with respect to the refundable tuition payments, the bankruptcy court correctly determined that the debtor's children were the initial transferees.

### 3. *The timing matters.*

The schools' position, of course, is that the bankruptcy court's ruling was correct as to *all* the tuition payments, whenever made. Indeed, Hofstra and Fairfield argue that the timing of the debtor's payments is "irrelevant." Hofstra Br. 30; Fairfield Br. 27. In support, they point to language in *Custom Contractors* saying that "the timing of the transfers has no impact on the IRS's rights or obligations because no matter how much time passes between the transfers, the IRS can never be conceived of as a creditor." 745 F.3d at 1352; *see* Hofstra Br. 31; Fairfield Br. 27. But the schools misunderstand the Eleventh Circuit's ruling. The court in *Custom Contractors* was distinguishing its factual scenario, discussed earlier in this opinion, from the facts of *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988),

in which the timing of transfers was integral to determining whether a debt had been incurred:[11]

The debtor in *Societe Generale* wired money from its Crédit Lyonnais bank account to another corporation's Société Générale bank account so that a check that had been recently drawn on the Société Générale account would clear. *See id.* at 1198. By the time the wire transfer arrived, however, Société Générale had already honored the check because Crédit Lyonnais had assured it that the money was on the way. *See id.* On those facts, the court ruled that Société Générale was a mere conduit of funds that were transferred from the debtor to the payee of the check. *See id.* at 1201. Although technically Société Générale received the transfer from the debtor *after* it honored the check, the court determined that "the transaction was effectively simultaneous," because Société Générale "knew with absolute certainty that Credit Lyonnais[] had wired enough money to cover the check" and thus Société Générale was not a creditor in any real sense. *Id.*

As the *Custom Contractors* court explained, "[i]n *Societe Generale*, . . . the timing of the transfers was integral to the determination that the bank and the debtor did not enter into a debtor-creditor relationship." 745 F.3d at 1351. Specifically, if the court had considered the transfer *to* Société Générale "as actually and effectively occurring later in time than" the transfer *from* Société Générale, then the latter transfer "could have been characterized as a loan, and the [former] transfer could have been characterized as payment of a debt," thereby rendering Société Générale an initial transferee. *Id.* at 1351–52. By contrast, in *Custom Contractors*, the timing of the payments was irrelevant because "[a]t no point" in that case did the member "*actually* owe" anything to the IRS. *Id.* at 1351.

---

[11] *Societe Generale*, like *Bonded* itself, was cited with approval by the Second Circuit when it adopted the "mere conduit" test. *See Finley*, 130 F.3d at 58.

In this appeal, however, timing is everything. Once the deadline to withdraw from school had passed, the schools were actually owed tuition—they were creditors. That neither the schools nor the debtor's children were creditors *of the debtor* (*cf.* Fairfield Br. 27; Hofstra Br. 31) is irrelevant. And once the schools received the tuition that they were owed, it was theirs to do with as they wished; at no time could an obligation to refund that money to the debtor's children have arisen. *Cf. Custom Contractors*, 745 F.3d at 1350 ("[F]unds received as payment of a debt leave the recipient with no obligations; that is, the transferee receives them with no strings attached."). Hence, as to any nonrefundable payments by the debtor, the schools were the initial transferees. *See, e.g.*, *Warnaco*, 2006 WL 278152, at *7 (ruling that company that received "reimbursement" for payments already made was "an initial transferee" because it was "a creditor and not a conduit").[12]

## C.  The bankruptcy court's ruling is unsupported by the record.

The bankruptcy court did not discuss the timing of the tuition payments in detail. Rather, it simply found that the schools "did not exercise dominion and control over the tuition payments at the time . . . the Debtor made the transfers" because "the [schools] [were not] authorized to utilize the funds" at that time. Appellant App. Pt. I, at TA0016. And the bankruptcy court stated that if one of the debtor's children "decided to withdraw from [his or her] program, the student, and not the Debtor or the [school], [would be] entitled to any funds remaining in the account." *Id.* at TA0016. On that basis, the bankruptcy court determined that the debtor's children were the initial transferees and that the schools, "as subsequent transferees," could "assert the good faith defense provided by § 550(b)." *Id.* at TA0018.

---

[12] Before the bankruptcy court, the schools raised a number of arguments why, even if they are considered initial transferees, they would still not be liable to the trustee. *See* Appellant App. Pt. I, at TA0004–05. The bankruptcy court did not reach those issues (*see id.* at TA0014), and they were not raised on appeal, so I leave them to the bankruptcy court to address, as necessary, in the first instance.

In so finding, the bankruptcy court appears to have assumed that all the debtor's payments were made early enough to be refundable. *See* Appellant Br. 22. Insofar as that assumption is correct, I would affirm the bankruptcy court's ruling. But as the trustee observes, "there was no evidence in the record to support this finding." *Id.* Indeed, neither Fairfield nor Hofstra even argue to the contrary.[13] And Brooklyn Law states that *one payment*, of $4578.00, was refundable—but it remains silent as to the rest of the $27,692.42 that it received (*see* Brooklyn Br. 5–6, ECF No. 8), tacitly suggesting that most of the tuition that the debtor paid to Brooklyn Law was nonrefundable. What is more, although the record appears to reflect a largely semiannual, July/December schedule of likely refundable payments to the schools, the record also contains evidence of several payments that at least *appear* to have been nonrefundable. *Compare, e.g.*, Appellant App. Pt. II, at TA0254 (showing tuition payment made to Hofstra on October 5, 2015), *with Fall 2015 Academic Calendar and Deadlines*, Hofstra U., http://web.archive.org/web/20161104150636/https://www.hofstra.edu/studentaffairs /studentservices/academicrecords/academic-records-fall-2015-calendar.html (archived Nov. 4, 2016) (indicating that "100% Tuition refund" was available only until September 8 and that "25% Tuition refund" was available only until September 29).[14]

Because the refundability of the payments affects the initial-transferee determination, I must remand these cases to the bankruptcy court for further factual development.

---

[13] Rather, they assert that the timing of the payments "is irrelevant." Hofstra Br. 30; *accord* Fairfield Br. 27 ("[T]he timing is legally irrelevant."). *But see supra* Section B.3.

[14] I am not now determining whether this or any payment was in fact nonrefundable, nor am I relying on this or any party's website to reach any conclusions (*cf. Braun v. United Recovery Sys., LP*, 14 F. Supp. 3d 159, 169 (S.D.N.Y. 2014) (discussing propriety of taking judicial notice of contents of party's website)). I simply find that, with the exception of the single payment to Brooklyn Law already mentioned, the record is silent as to whether the debtor's tuition payments were refundable or nonrefundable and that, viewing the facts in the light most favorable to the trustee, any implicit finding by the bankruptcy court that *every* tuition payment was refundable is not supported by the record.

## CONCLUSION

In sum, I agree with the bankruptcy court's reasoning as to *refundable* payments made by the debtor. But because the record does not support a conclusion that all the payments in these cases were refundable, I vacate the decision of the bankruptcy court and remand these cases for further proceedings consistent with this opinion.[15]

So ordered.

___/s/_____
Allyne R. Ross
United States District Judge

Dated:      January 4, 2019
             Brooklyn, New York

---

[15] The previous version of this opinion could have been read to suggest that I had found that registration for classes marked the point after which any payments would be nonrefundable. *See* Mot. for Rehr'g 2–3, ECF No. 15. As should now be clear, I make no finding as to when each school's tuition payments were refundable or nonrefundable. That factual question was not briefed on appeal, and I express no opinion on it.